1
2
3
4
5
6
7              IN THE UNITED STATES DISTRICT COURT

8            FOR THE EASTERN DISTRICT OF CALIFORNIA

9
10   DARRELL M. PATTERSON,

11              Petitioner,              No. CIV S-02-2321 FCD EFB P

12        vs.

13   EDWARD ALAMEIDA, Warden,

14              Respondent.              <u>ORDER SETTING EVIDENTIARY HEARING</u>

15   _____/

16        Petitioner is a state prisoner proceeding through counsel with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2000 judgment of

18   conviction entered against him in the Sacramento County Superior Court on the charge of

19   robbery.  One of petitioner's claims for relief is that his conviction must be reversed because the

20   prosecutor exercised a peremptory challenge to strike a juror on the basis of race, in violation of

21   *Batson v. Kentucky*, 476 U.S. 79 (1986).  For the reasons explained below, this court will order

22   an evidentiary hearing on petitioner's *Batson* claim.

23   **I.  State Court Decision**

24        The last reasoned decision with respect to petitioner's claim of discrimination in the

25   selection of his jury is the opinion of the California Court of Appeal on petitioner's direct

26   appeal.  The Court of Appeal explained the facts surrounding this claim and its legal analysis as

1

follows:

> Defendant contends the trial court erred in denying his *Wheeler* motion after the prosecutor used a peremptory challenge against a prospective juror who was African-American because the timing of the prosecutor's challenge established a reasonable inference the challenge was based on the prospective juror's race. In denying defendant's motion, the trial court implicitly found defendant had failed to make a prima facie showing the challenge was based on race. Because there is substantial evidence in the record to support that finding, we conclude the trial court did not err in denying defendant's *Wheeler* motion.

> The facts relevant to this claim of error are as follows: Defendant is African-American, as was R.E., one of the prospective jurors on the initial panel of 12. After the initial panel and six other prospective jurors were questioned by the court and counsel, each side exercised three peremptory challenges. The prosecutor then indicated the People would accept the jury. The panel at that time included six of the original panel of 12, including R.E., and the other six prospective jurors who had been questioned. Defense counsel, however, exercised another peremptory challenge, and seven new prospective jurors were called. After the new prospective jurors were questioned, each side exercised one more peremptory challenge, and the prosecutor again indicated the people would accept the jury, which still included R.E. Defense counsel, however, exercised another peremptory challenge, which was followed by another challenge from the prosecutor. The vacant seat on the panel (No. 7) was then filled by another African-American, and defense counsel passed for the first time. At this point, the prosecutor exercised a peremptory challenge to excuse R.E. Defense counsel asked to approach and objected to the prosecutor's use of a peremptory challenge against R.E. under *Wheeler*.[1] The court denied defendant's *Wheeler* motion off the record and proceeded with peremptory challenges. Defense counsel and the prosecutor both passed and the jury was sworn after two alternates were selected.

> That afternoon, the court allowed defense counsel to make a record of his *Wheeler* motion. Defense counsel informed the court the first trial had resulted in a mistrial because an African-American juror had held out for acquittal. Counsel then pointed out that the prosecutor had "once, if not more times" accepted the jury with R.E. on it, only to challenge her when a second African-American was seated. Counsel claimed he had made out a prima facie case of a *Wheeler* violation because the prosecutor had expressed

---

[1] It does not appear from the record what relief defendant requested in his *Wheeler* motion. We presume, however, defendant sought the appropriate relief, which was to quash or dismiss the jury venire. (*See People v. Williams* (1997) 16 Cal.4th 635, 662, fn. 9.)

satisfaction with the jury with R.E. on it and because the lone holdout at the first trial had been African-American.  The prosecutor responded that he was not trial counsel at the previous trial and did not know if the holdout had been an African-American.  The prosecutor also contended defendant had failed to make a prima facie showing of a *Wheeler* violation, stating: "There are reasons that [R.E.] stated, and her demeanor here in court speaks for why I would exercise a peremptory challenge. [If] [t]he Court feels a prima facie case can be made I could state my reasons for the record, but I don't think I'm required to do so at this point."  The court asked if defense counsel had anything else, and when counsel said "No," the court denied the motion without further inquiry.

"It is well settled that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial group violates both the state and federal Constitution."  (*People v. Turner* (1994) 8 Cal.4th 137, 164.)  "Under *Wheeler*, there is a presumption that a prosecutor uses his peremptory challenges in a constitutional manner. [Citation.] The defendant bears the burden to show, prima facie, the presence of purposeful discrimination. [Citation.]  If he succeeds, the burden shifts to the prosecutor to show its absence." (*People v. Alvarez* (1996) 14 Cal.4th 155, 193.)

"Under *Wheeler* and *Batson* [*v. Kentucky* (1986) 476 U.S. 79, 89 (90 L.Ed.2d 69]], '"[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court.  First, . . . he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . .'"' (*People v. Box* (2000) 23 Cal.4th 1153, 1187-1188.)

"The trial court's determination that no prima facie showing of group bias has been made is subject to review to determine whether it is supported by substantial evidence. [Citation.] We examine the record of the voir dire and accord particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 993-994.)  "When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire.' [Citation.] 'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'"' (*People v. Box, supra*, 23 Cal.4th at p.

1188.)

Here, the record does suggest grounds on which the prosecutor might reasonably have challenged R.E.  During voir dire, R.E. indicated her brother had been arrested for a felony and incarcerated the year before.  The incarceration of her brother was a ground on which the prosecutor could reasonably have challenged R.E. because it was evidence she could be biased against the prosecution.  (*See People v. Douglas* (1995) 36 Cal.App.4th 1681, 1689-1690 [finding reasonable use of peremptory challenge when family members of prospective juror had criminal records.].)  In fact, immediately before excusing R.E., the prosecutor excused another prospective juror who had stated he knew some people who were involved with the criminal justice system.  This tends to bolster the suggestion the prosecutor excused R.E. because of her brother's incarceration.

In addition, the prosecutor referred to R.E.'s "demeanor here in court" as a reason why he exercised a peremptory challenge against her.  Although R.E.'s demeanor is not apparent on the face of the record on appeal, the trial court certainly was in a position to evaluate whether that factor could have played a legitimate role in the prosecutor's peremptory challenge of R.E.  "[S]ubjective factors, not apparent on the record or easily articulable, may legitimately play a critical role in an attorney's exercise of a peremptory challenge."  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1249.)  That is the reason "we generally defer to the findings of the trial court."  (*Ibid.*)

Defendant contends any explanation for the prosecutor's challenge of R.E. other than her race "must be rejected as highly implausible because the prosecut[or] twice accepted the jury panel when it included" R.E. and challenged her only after another African-American was seated on the jury.  The timing of the prosecutor's challenge, however, does not compel us to overturn the trial court's implied finding the challenge was not race-based.  It is not unusual for counsel to exercise peremptory challenges based on the composition of the jury as a whole.  As our Supreme Court has acknowledged: "It is clear that knowledge of the composition of the entire panel can be relevant to the informed exercise of a peremptory challenge against a particular juror."  (*People v. Wright* (1990) 52 Cal.3d 367, 397.)  That the prosecutor was twice satisfied with a panel that included R.E., but later changed his mind when another prospective juror who was also African-American was seated, does not lead inexorably to the conclusion the prosecutor's dissatisfaction with R.E. must have been motivated by a desire to limit the jury to one African-American.  Any number of factors may have played into the prosecutor's determination that the panel's composition was unacceptable when he finally decided to excuse R.E.  In this regard, it is significant to note the prosecutor initially accepted a panel that included

prospective juror M.J., but then exercised his very next peremptory challenge to excuse M.J. after defense counsel had excused another prospective juror.  That another prospective juror suffered the same fate as R.E. undercuts defendant's suggestion that the timing of the prosecutor's peremptory challenge of R.E. proves the challenge must have been race-based.

Defendant also contends the prosecutor's challenge of R.E. must have been based on her race because "the prosecutor showed a keen interest in whether she thought that African [-] Americans were treated unfairly by the criminal justice system."  The record shows that after eliciting from R.E. the fact her brother was incarcerated, the prosecutor asked R.E. if she had "any feelings in particular one way or another as to whether the criminal justice system is fair or unfair toward African [-] Americans?"  When R.E. responded "No," the prosecutor then asked the same question of the rest of the panel.

Defendant contends "[t]his disparate treatment of [R.E.] in being singled out to answer questions about her view towards African [-] American[s'] treatment in the courts further suggests group bias."  We disagree.  The prosecutor asked the same question of all the prospective jurors; he may have asked R.E. the question first simply because the idea to ask the question was sparked by her statement that her brother was incarcerated.  In any event, as noted above, our task is to review the trial court's implied finding that defendant did not make a prima facie showing of a *Wheeler* violation for substantial evidence.  Because the record suggests grounds on which the prosecutor might reasonably have challenged R.E., we conclude substantial evidence supports the trial court's finding.  Neither the timing of the prosecutor's challenge nor the prosecutor's question regarding how the justice system treats African-Americans compels a different result.

Having participated in the jury selection process, the trial judge was in the best position to determine under all the relevant circumstances whether it was reasonable to infer the prosecutor challenged R.E. because of her race.  (*See People v. Box, supra,* 23 Cal.4th at p. 1189.)  Because there is substantial evidence in the record to support the trial court's implied finding that defendant did not make a prima facie showing the challenge was race-based, we conclude the court did not err in denying defendant's *Wheeler* motion.

March 24, 2003 Answer, Ex. D (hereinafter "Opinion") at 3-10.

## II.  Legal Standards

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution.  *See Batson*,

476 U.S. at 85; *Johnson v. California*, 545 U.S. 162 (2005).  So-called *Batson* claims are evaluated pursuant to a three-step test:

> First, a defendant the movant must make a prima facie showing that the prosecution has engaged in the discriminatory use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.]  Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question.  [Citation omitted.]  Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

*Tolbert v. Gomez*, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

The defendant bears the burden of persuasion to prove the existence of unlawful discrimination.  *Batson*, 476 U.S. at 93.  "This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'"  *Yee v. Duncan,* 463 F.3d 893, 898 (9th Cir. 2006) (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995)).  However, "the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'"  *Batson,* 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562 (1953)).  The "striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated . . ."  *Turner v. Marshall*, 121 F.3d 1248, 1255 n.4 (9th Cir. 1997) (quoting *United States v. Battle*, 836 F.2d 1084, 1086 (8th Cir.1987)).

**III.  Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) of the AEDPA sets forth the following standards for granting habeas corpus relief:

////

1

        An application for a writ of habeas corpus on behalf of a
2       person in custody pursuant to the judgment of a State court shall
        not be granted with respect to any claim that was adjudicated on
3       the merits in State court proceedings unless the adjudication of the
        claim -

4           (1) resulted in a decision that was contrary to, or involved
        an unreasonable application of, clearly established Federal law, as
5       determined by the Supreme Court of the United States; or

6           (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
7       State court proceeding.

8   28 U.S.C. § 2254(d).

9       The decision of the Court of Appeal rejecting petitioner's *Batson/Wheeler* claim is

10  therefore entitled to deference under the AEDPA unless it is contrary to or an unreasonable

11  application of clearly established federal law as determined by the United States Supreme Court.

12  28 U.S.C. § 2254(d).  If, on the other hand, the Court of Appeal applied an incorrect legal

13  standard in reaching its decision, the deference required by AEDPA is not warranted and this

14  court must review petitioner's claim *de novo*.  *Wade v. Terhune*, 202 F.3d 1190, 1197 -1198 (9th

15  Cir. 2000).

16      The California Court of Appeal cited both *Wheeler* and *Batson* as legal precedent in

17  support of its conclusion that petitioner did not establish a prima facie case of racial

18  discrimination in jury selection.[2]  Opinion at 6.  Specifically, the appellate court opined that in

19  order to establish a prima facie case, a petitioner must show "a strong likelihood [or reasonable

20  inference] that such persons are being challenged because of their group association."  *Id*.  In

21  *Wade*, the Ninth Circuit Court of Appeals compared the standards articulated in *Wheeler* and

22  *Batson* with regard to the establishment of a prima facie case.  The court noted that *Batson*

23  required only that "the defendant must demonstrate that the facts and circumstances of the case

24
        [2]  *People v. Wheeler* is "the California counterpart to *Batson*."  *Yee*, 463 F.3d at 896.
25  Although petitioner made his motion pursuant to *Wheeler*, the standards set forth in *Batson*
    control this court's disposition of this case.  *Lewis v. Lewis*, 321 F.3d 824, 827 & n.5 (9th Cir.
26  2003).

7

'raise an inference' that the prosecution has excluded venire members from the petit jury on account of their race.  202 F.3d at 1195.  *Wheeler*, in contrast, decided eight years before *Batson*, demanded that the defendant 'show a strong likelihood' that the prosecutor had excluded venire members from the petit jury on account of their race.  *Id.* at 1195-96.  The court in *Wade* concluded that "*Batson* and *Wheeler* thus may be thought to prescribe different tests for establishing a prima facie case."  *Id.* at 1196.  The court noted, however, that California courts disagreed as to whether the two phrases actually referred to the same standard.  *Compare People v. Fuller*, 136 Cal.App.3d 403, 423 (1982) (holding that the two phrases referred to the same standard) and *People v. Bernard*, 27 Cal.App.4th 458 (1994) (holding that the "strong likelihood" test was in fact a less stringent standard than the "reasonable inference" test.).  The court in *Wade* concluded that from the date of the *Bernard* decision forward, "the California state courts ha[d] applied a lower standard of scrutiny to peremptory strikes than the federal Constitution permits."  *Wade*, 202 F.3d at 1196-97.  In this regard, the court stated,

> The California Supreme Court now routinely insists, despite *Batson*, that a defendant must show 'a strong likelihood' of racial bias.  Its consistent practice is to cite *Batson* and *Wheeler* together as controlling law but to quote the 'strong likelihood' language from *Wheeler* rather than the 'raise an inference' language from *Batson*.  (Citation omitted.)  *Batson* is, of course, the law of the land. California law may give greater protection to criminal defendants than is required by the federal Constitution, but it cannot give less. Yet this is precisely what the California courts now do when they follow the *Wheeler* 'strong likelihood' test in determining whether a prima facie case has been established.

> * * *

> AEDPA directs us to defer to state court determinations unless they involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court. See 28 U.S.C. § 2254(d). Where the California courts follow the "strong likelihood" language of *Wheeler* without any indication that they are actually applying a "reasonable inference" test consonant with *Batson*, they apply an incorrect legal standard. In such a case, we need not--indeed, should not--give deference to their determination that a defendant has failed to establish a prima facie case of bias. Because the California courts followed the "strong likelihood" test of *Wheeler* rather than the "inference" test

> of *Batson* in adjudicating petitioners' claims of racial bias in the
> prosecution's use of its peremptory challenges, we review the
> petitioners' *Batson* claims de novo.

*Id.* at 1197.

In *People v. Box*, 23 Cal.4th 1153, 1188 n.7 (2000), the California Supreme Court

acknowledged *Wade* and explained that "in California, a 'strong likelihood' means a 'reasonable

inference .'" *Box* disapproved *Bernard* to the extent it was inconsistent with *Wheeler*.  *Id.*

Subsequently, the California Supreme Court explained that:

> Accordingly, *Wheeler's* standard for establishing a prima facie case
> of discriminatory use of peremptory challenges *is, and always has
> been*, compatible with *Batson*. It merely means that to state a prima
> facie case, the objector must show that it is more likely than not
> the other party's peremptory challenges, if unexplained, were based
> on impermissible group bias.  (Emphasis added.)

*People v. Johnson*, 30 Cal.4th 1302, 1318 (2003).

In *Johnson v. California*, the United State Supreme Court disproved the "more likely

than not" standard set forth in *People v. Johnson*.  The court held that "instead, a defendant

satisfied the requirement of *Batson's* first step by producing evidence sufficient to permit the

trial judge to draw an inference that discrimination has occurred."  545 U.S. at 170.  In other

words, the Supreme court concluded that the standard the California courts had been applying

since 1994 for a prima facie showing of racial discrimination in jury selection (and, thus, the

standard that they applied in this case) was incompatible with *Batson*.

In this case, as described, the California Court of Appeal evaluated petitioner's claim

using the "strong likelihood/reasonable inference" language set out in *Box*.  Opinion at 6.

Respondent argues that because the appellate court's opinion was issued after the decision in *Box*

but before the state court ruling in *People v. Johnson*, the Court of Appeals was relying on the

correct standard and its decision is entitled to the deference required by the AEDPA.

Respondent's November 2, 2007 Supplemental Answer (hereinafter "Supp. Answer") at 7.

////

Respondent argues that "it was not until after *People v. Johnson* that California courts began to apply the errant 'more likely than not' standard." *Id.* In other words, respondent is arguing that for a two-year period between the decision in *Box* and the decision in *People v. Johnson*, a state court decision on a *Batson/Wheeler* claim is entitled to deference under the AEDPA because the California courts were relying on the correct federal standard. Petitioner argues, on the other hand, that California courts have always imposed a higher burden of proof than permitted by *Batson* and that the decision in *Box* "did not somehow temporarily reduce this burden to the correct 'inference' standard required by *Batson*." Petitioner's November 15, 2007 Supplemental Reply Memorandum (hereinafter "Supp. Reply") at 4.

The California Supreme Court concluded in *Johnson* that *Wheeler*'s "strong likelihood" standard "is and always has been" the same as the "reasonable inference" standard found in *Batson*. However, in *Cooperwood v. Cambra*, 245 F.3d 1042, 1047 (9th Cir. 2001), the Ninth Circuit specified that *de novo* review of *Batson* claims applies to cases tried prior to 2000, when *Box* was decided. The circuit court reasoned that *de novo* review applied because, between the California state courts' decisions in *Bernard* and *Box*, California state courts were applying the *Wheeler* "strong likelihood" standard in a more stringent manner than the *Batson* "reasonable inference" standard and thus applying a lower standard of scrutiny to peremptory strikes than permitted under the federal Constitution. *Cooperwood*, 245 F.3d at 1046-47. The Ninth Circuit therefore insinuated in *Cooperwood* that the timing of a state court decision may impact a reviewing court's decision whether to use *de novo* review or the deference required by the AEDPA when deciding a *Batson/Wheeler* claim.

In this case, petitioner's state trial occurred in 2000, shortly before *Box* was issued. The appellate court denied petitioner's direct appeal in 2002, after *Box* was issued. Relying on the holding in *Box*, the California Court of Appeals stated that petitioner was required to show a "strong likelihood [or reasonable inference]" of bias in order to demonstrate a prima facie case.

////

1   However, the court did not clearly indicate that it was actually applying a reasonable inference

2   test consonant with *Batson*, as opposed to the more stringent test set forth in *Wheeler*.  As

3   explained in *Johnson*, state courts had "always" applied the same standard, using a "more likely

4   than not" test.  *Johnson*, 30 Cal.4th at 1318.  It is reasonable to assume that the appellate court in

5   this case used that same discredited standard.  Indeed, as the appellate court itself recounts, the

6   trial court did not address whether circumstances which could support a reasonable inference had

7   been shown, but rather, imposed a higher standard in refusing to require an explanation from the

8   prosecutor.  As the appellate court explained, the fact that the prosecutor twice before accepted

9   R.E. on the panel but struck R.E. after another African American was added "does not lead

10  inexorably to the conclusion the prosecutor's dissatisfaction with R.E. must have been motivated

11  by [race]."  Opinion at 8.  With all due respect, that is not the standard for whether the

12  circumstances presented give rise to a prima facie case.  The California Court of Appeal

13  employed an incorrect legal standard in determining whether petitioner had established a prima

14  facie case of racial discrimination in selecting his jury.

15          Normally, this court will defer to a state court determination whether a prima facie case

16  of impermissible bias in the exercise of peremptory challenges has been shown.  *Tolbert v. Page*,

17  182 F.3d 677, 685 (9th Cir. 1999).  However, because the state court may have employed the

18  wrong legal standard, the undersigned must review this claim *de novo*.  *Paulino v. Castro*, 371

19  F.3d 1083, 1090 (9th Cir. 2004) (federal court of appeals examined *Batson* claim *de novo*

20  because the state court used the wrong legal standard when analyzing whether defendant made a

21  prima facie showing of bias); *Cooperwood*, 245 F.3d at 1045 (where the state court has used, or

22  may have used, the "strong likelihood" standard for reviewing a *Batson* claim, a reviewing court

23  does not defer to the state court's determination of whether a prima facie case has been shown);

24  *Wade*, 202 F.3d at 1195 (same).  *Cf. Boyd v. Newland*, 467 F.3d 1139, 1144 (9th Cir. 2006)

25  (court applied AEDPA deferential standard where state court specifically observed that the

26  ////

11

1   petitioner had failed to establish a prima facie case under either state or federal law).[3]

2   **IV.  Analysis**

3          Petitioner argues that the trial court erred in finding that he failed to demonstrate a prima

4   facie case of racial discrimination with respect to the prosecutor's strike of juror R.E.  He claims

5   that the California Court of Appeal improperly considered possible reasons for the prosecutor's

6   exclusion of juror R.E. that were not articulated by the prosecutor or the trial judge.  December

7   12, 2002 Am. Pet. at consecutive pgs. 10-11.  Specifically, he faults the appellate court for

8   elaborating on the prosecutor's suggestion that he relied on the "demeanor" of R.E. to exclude

9   her, when the appellate court "could not say for sure what the offending mannerisms were."  *Id.*

10  at 11.  Petitioner also faults the appellate court for relying on the fact that another juror had been

11  excused from the jury after originally being accepted, because R.E. and the other excused juror

12  "shared no other characteristic in common."  *Id.*  Finally, petitioner argues that the state

13  appellate court improperly suggested that R.E. may have had a bias against the criminal justice

14  system because of her brother's incarceration, noting that R.E. denied such a bias on voir dire.

15  *Id.*  In short, petitioner contends that the appellate court improperly manufactured reasons to

16  explain why the prosecutor may have excluded juror R.E.

17         In order to establish a prima facie case of racial discrimination, petitioner must show that

18  "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

19  peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

20  inference that the strike was motived by race."  *Boyd*, 467 F.3d at 1143 (citing *Batson*, 476 U.S.

21  at 96 and *Cooperwood*, 245 F.3d at 1045-46).  A prima facie case of discrimination "can be

22  made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives

23  'rise to an inference of discriminatory purpose.'"  *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476

24  ─────────────────────

25         [3] Even using the deferential standard of review required by the AEDPA, this court would
    conclude that the state courts' finding that petitioner failed to establish a prima facie case of
    racial discrimination in the selection of petitioner's jury is an unreasonable application of federal
26  law.  28 U.S.C. § 2254(d).

                                                    12

U.S. at 94.)  In evaluating whether a defendant has established a prima facie case, a reviewing court should consider the "'totality of the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike."  *Boyd*, 467 F.3d at 1146 (quoting *Batson*, 476 U.S. at 94, 96) This should include a review of the entire transcript of jury voir dire in order to conduct a comparative analysis of the jurors who were stricken and the jurors who were allowed to remain. *Boyd*, 467 F.3d at 1149 ("We believe, however, that Supreme Court precedent requires a comparative juror analysis even when the trial court has concluded that the defendant failed to make a prima facie case").[4]  "If a prosecutor's preferred reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination."  *Miller-El*, 545 U.S. at 241.  *See also Kesser v. Cambra*, 465 F.3d 351, 360 (9th Cir. 2006) ("the "totality of the relevant facts" includes "the characteristics of people [the prosecutor] did not challenge.").

The first and second elements of the *Batson* test for determining whether a prima facie case has been established are met here because R.E. is African-American and the prosecutor used a peremptory challenge to remove her.  The issue presented is whether the trial court erred in failing to find an inference that the strike of R.E. was motivated by race.

In *Johnson*, the United States Supreme Court discussed the level of proof necessary to establish a prima facie case under *Batson*.  In that case, the prosecutor used three of his peremptory challenges to eliminate the only African-American prospective jurors from the jury pool.  545 U.S. at 165.  The defense raised a *Batson* challenge after the second and third strikes against black jurors.  *Id.*  The Supreme Court concluded that in order to demonstrate a prima facie case, the defense was only required to "produc[e] evidence sufficient to permit the trial

---

[4]  Comparative juror analysis refers to "an examination of a prosecutor's questions to prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise similar jurors differently because of their membership in a particular group." *Boyd*, 467 F.3d at 1145. *See also Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) (stating that "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve" was "more powerful" than bare statistics).

judge to draw an inference that discrimination has occurred." *Id.* at 170.  The court explained:

> We did not intend the first step to be so onerous that a defendant
> would have to persuade the judge – on the basis of all the facts,
> some of which are impossible for the defendant to know with
> certainty – that the challenge was more likely than not the product
> of purposeful discrimination.

*Id.*[5]  Accordingly, in *Johnson*, the Supreme Court found that the defendant had demonstrated a prima facie case of racial discrimination where all three of the Black prospective jurors were stricken and the state court judges found the circumstances suspicious.  *Id.* at 173.  In *Batson*, the Supreme Court held that the petitioner had established a prima facie case when he objected to the prosecutor's decision to strike "all black persons on the venire."  476 U.S. at 100.

As described above, the prosecutor dismissed juror R.E. immediately after another African-American juror was seated, thereby limiting the jury to only one black juror.  That decision was never explained.  The prosecutor's offer to explain was expressly declined by the trial judge.  The appellate court, applying a standard in conflict with United States Supreme Court precedent, concluded that the circumstances presented here "does not lead inexorably to the conclusion the prosecutor's [decision] must have been motivated by [race]."  Opinion at 8. The appropriate standard is whether the circumstances are "sufficient to permit the trial judge to draw an inference that discrimination has occurred."  *Johnson,* 545 U.S. at 170 (citing *Batson*, 476 U.S. at 96).  Application of that standard here demonstrates that the trial judge was required to inquire of the prosecutor for an explanation of the strike.

Petitioner's trial counsel offered two reasons to support his argument that these circumstances gave rise to a prima facie case of discrimination: (1) petitioner's first trial had resulted in a mistrial because of a holdout black juror and, for this reason, the prosecutor may have wanted to limit the number of African-Americans on the jury; and (2) the prosecutor had twice been willing to retain R.E. on the jury, notwithstanding her demeanor and her answers

---

[5] That is precisely how the trial court and state appellate court applied the prima facie step here.

during voir dire, but suddenly excused her after a second African-American juror was seated on the jury.  In other words, defense counsel posed this question: if R.E.'s answers on voir dire were not enough to exclude her initially, what changed to make her unacceptable, other than the fact that there would have been two African-Americans on the panel, thereby increasing the likelihood of another hung jury?

The prosecutor responded that he was unaware the holdout juror at petitioner's first trial was African-American.  However, he did not explain whether he suspected this to be the case.  Under the circumstances, it is a fair inference that he did.  It is noteworthy, in this regard, that R.E. was stricken by the prosecutor immediately after another African-American juror was seated.  This court concludes that the circumstances surrounding the prosecutor's strike of juror R.E. give rise to an inference of racial bias in jury selection with respect to juror R.E.  *See Williams v. Runnels*, 432 F.3d 1102, 1107 (9th Cir. 2006) (defendant established an inference of racial discrimination under *Batson* based on statistical analysis alone, where defendant was African-American, the prosecutor used three of his first four peremptory challenges to remove African-Americans from the jury panel and only four of the first forty-nine potential jurors were African-American); *Fernandez v. Roe*, 286 F.3d 1073, 1077-80 (9th Cir. 2002) (inference of bias where four out of seven Hispanics and two blacks were excused by the prosecutor); *Turner v. Marshall*, 63 F.3d at 812, *overruled on other grounds by Tolbert v. Page*, 182 F.3d at 681 (prima facie showing where prosecutor challenged five out of a possible nine African-American jurors).  However, the court will consider whether any other relevant circumstances refute this inference.

The court will first address the prosecutor's statement to the trial judge that he dismissed juror R.E. because of "reasons that [she] stated."  Reporter's Transcript on Appeal ("RT") at 17.  The court will assume that the prosecutor was referring to R.E.'s answers on voir dire.  During voir dire, juror R.E. disclosed that her brother, a drug addict, had been involved in criminal proceedings and was incarcerated.  Augmented Reporter's Transcript on Appeal ("ART") at 815,

830-31.  R.E. stated that she did not participate in those proceedings in any way and had not

discussed them with her brother.  *Id.*  She answered "no" when asked whether she had "any

feelings either good or bad with regard to the criminal justice system insofar as your experience

with it or your brother's experience with it?"  *Id.*  She also stated she did not have "any feelings

in particular one way or another as to whether the criminal justice system is fair or unfair toward

African Americans."  *Id.* at 815-16.  Later during voir dire, juror R.E. stated that "over 40 years

ago" a friend of hers was murdered and that she testified before the Grand Jury.  *Id.* at 822-23.

She was not called as a witness because the suspect confessed to the crime.  *Id.*  R.E. stated that

she believed she was treated fairly and that, as a result of her experience, she had "positive"

feelings about the criminal justice system.  *Id.* at 823.  On its face, the voir dire of juror R.E. did

not disclose any particular reason for excusing her.  Although she had been involved in the

criminal justice system, the experience left her with a positive feeling.

A comparison of R.E.'s answers to the prosecutor's voir dire questions and the answers

of other jurors is instructive.  Juror No. 1 and "other people" he knew had been arrested for

D.U.I.  *Id.* at 824.  Similar to juror R.E., juror No. 1 said he had "no hard feelings."  *Id.*  Juror

No. 9 had been arrested for theft 35 years earlier.  *Id.* at 829.  He stated that he had no "strong

feelings about it" because he "had it coming."  *Id.*  Juror No. 9 also stated his daughter was the

victim of a rape 9 years earlier, and that the police were "still doing their work."  *Id.* at 830.

Juror No. 11 stated that his brother was arrested for drug possession twenty years before, but that

he had no "strong feelings about the police because of that incident."  *Id.* at 835.  This juror also

stated that his stepson was arrested for car theft.  *Id.*  He explained he did not know much about

the details, but that he did not have "any feelings about the system" as a result.  *Id.* at 826.  Juror

No. 12 stated that 19 years before, her sister-in-law was the victim of a crime but that she had no

"strong feelings about the way law enforcement investigated the case."  *Id.* at 834-35.  All of

these jurors had similar or more negative experiences with the criminal justice system than did

R.E.  Like R.E., these jurors stated they had no negative feelings about the criminal justice

1   system or the police.  However, the jurors described above were allowed to serve on the jury,

2   while juror R.E. was excused.  In light of the above, a comparative analysis of juror R.E. and

3   jurors who were retained does not refute the inference of bias arising from the circumstances of

4   the peremptory challenge of R.E.

5       The prosecutor also suggested that R.E.'s "demeanor" may have prompted his decision to

6   excuse her from the jury.  Opinion at 7.  However, R.E.'s demeanor was apparent long before the

7   prosecutor excused her.  As petitioner states, "[had] Juror E's 'demeanor' been so clear cut and

8   compelling, the prosecutor surely would have excused her by peremptory challenge prior to the

9   two times the jury was accepted."  Petitioner's September 21, 2007 Supplemental Memorandum

10  (hereinafter Supp. Memo) at 15.  The point is well taken.  The prosecutor's mention of

11  petitioner's demeanor does not refute the inference of bias under the circumstances presented

12  here.

13      In its decision, the California Court of Appeal surmised and discussed several possible

14  benign reasons for the prosecutor's dismissal of R.E., none of which were ever stated by the

15  prosecutor because he was never asked to explain his motivation.  Opinion at 7.  However,

16  reliance on speculation as to a possible non-discriminatory reason for the exclusion of R.E. is

17  contrary to the Supreme Court's admonition in *Johnson* that when determining whether a prima

18  facie case has been established, a judge should not "engag[e] in needless and imperfect

19  speculation [about the prosecutor's reasons for excluding a juror] when a direct answer can be

20  obtained by asking a simple question."  545 U.S. at 172.  On the contrary, a reviewing court

21  should not consider whether there are race neutral reasons for excluding a juror unless the

22  analysis has reached step three of the Wheeler/Batson framework.  *Miller El,* 545 U.S. at 252

23  ("[i]f the stated reason does not hold up, its pretextual significance does not fade because a trial

24  judge, or an appeals court, can imagine a reason that might not have been shown up as false");

25  *Paulino*, 371 F.3d at 1090 ("[I]t does not matter that the prosecutor might have had good reasons

26  . . . [w]hat matters is the real reason they were stricken"); *Holloway v. Horn*, 355 F.3d 707, 725

17

1  (3rd Cir. 2004) (speculation "does not aid our inquiry into the reasons the prosecutor actually

2  harbored" for a peremptory strike).

3     In addition to its application of a standard in conflict with United States Supreme Court

4  precedent, the state appellate court's suggested reasons do not bear scrutiny.  The court first

5  noted that R.E.'s brother had been arrested for a felony and incarcerated the year before.

6  Opinion at 7.  The court stated, "the incarceration of [R.E.'s] brother was a ground on which the

7  prosecutor could reasonably have challenged R.E. because it was evidence she could be biased

8  against the prosecution."  *Id.*  However, R.E. specifically stated she had no negative feelings

9  about the criminal justice system resulting from the incarceration of her brother.  Further, as

10  explained above, other white jurors who gave similar answers on voir dire were allowed to serve.

11     The state appellate court also stated:

12     In fact, immediately before excusing R.E., the prosecutor excused
       another prospective juror who had stated he knew some people
13     who were involved with the criminal justice system.  This tends to
       bolster the suggestion the prosecutor excused R.E. because of her
14     brother's incarceration.

15  *Id.*  As noted by petitioner, the juror excused by the prosecutor immediately prior to R.E. was

16  juror K.   ART at 862.  Juror K stated that he knew some people who had become involved with

17  the criminal justice system.  *Id.* at 849.  However, this juror also stated that he had gotten

18  "stopped" by the police or "actually sprawled on the ground" when he was with friends of Latino

19  or African-American descent, whereas he had not received this treatment when he was by

20  himself.  *Id.*  Because of this, he had drawn the conclusion that race might play a role in the way

21  police officers operate.  *Id.*  Because of his negative statements about police practices, juror K

22  was not comparable to juror R.E., who expressed only positive opinions about the criminal

23  justice system.

24     The California Court of Appeal also stated that the timing of the prosecutor's challenge

25  to juror R.E. did not compel it to overturn the trial court's finding of no prima facie case because

26  "it is not unusual for counsel to exercise peremptory challenges based on the composition of the

18

jury as a whole." Opinion at 8. Although this may be true as a general proposition, there is no

indication from the record that the changed makeup of the jury caused the prosecutor to strike

juror R.E.

The Court of Appeal noted that the prosecutor referred to R.E.'s "demeanor" as a reason

for his peremptory challenge, and surmised that the trial court may have agreed with the

prosecutor that this was a legitimate basis for the challenge. *Id.* at 7-8. The court stated "that is

the reason 'we generally defer to the findings of the trial court.'" *Id.* at 8. However, there is no

evidence in the record that the trial judge made a determination as to R.E.'s demeanor or based

his ruling on that ground. Accordingly, the appellate court's speculation in this regard is

insufficient to rebut the inference of discrimination. *See Snyder v. Louisiana*, 128 S.Ct. 1203,

1209 (2008) (improper to assume trial court found prosecutor reasonably relied on juror's

demeanor to exercise a strike where no indication from the record that the trial judge actually

made such a determination).

Petitioner produced evidence sufficient to permit the trial judge to draw an inference that

the prosecutor struck juror R.E. for a discriminatory reason and has met his burden to show that

"the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Batson*,

476 U.S. at 93-94. As petitioner points out, his defense at trial was that he was mis-identified as

the perpetrator because of the inability of the witnesses to make a cross-racial identification.

Petitioner's first trial resulted in a hung jury because of a lone holdout juror who was African-

American. It is apparent that the issue of race played a major part in petitioner's trial. This

context must be considered when considering whether an inference of discrimination existed in

connection with the dismissal of juror R.E. *Snyder*, 128 S.Ct. at 1208 ("in considering a *Batson*

objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear

upon the issue of racial animosity must be consulted"); *Kesser*, 465 F.3d 351 (reviewing court

must analyze peremptory strikes in the context of the trial as a whole). After a review of the

entire record, this court finds that the inferences that discrimination may have occurred in the

1  decision to strike juror R.E. were sufficient to establish a prima facie case under *Batson*.

2  **V. Remedy**

3         Because petitioner has demonstrated that the facts give rise to an inference of

4  discriminatory purpose, the burden shifts to the state to offer permissible race-neutral

5  justifications for the strike of juror R.E.  Petitioner requests an evidentiary hearing at which the

6  prosecutor would be afforded an opportunity to explain his reasons for excluding juror R.E.

7  Supp. Memo at 22.  Respondent argues that a hearing would not be helpful because, in all

8  likelihood, the prosecutor will not be able to remember why he excused R.E..  Supp. Answer at

9  15.  Respondent also "questions whether the prosecutor's likely failure to recall minute details of

10  the voir dire, or specifically facts about Juror [E.], will raise speculation that his reasons must

11  have been based on discrimination."  *Id.*  Whether the inference will be rebutted remains to be

12  seen.  But a suggestion that perhaps the prosecutor cannot meet the applicable burden is not a

13  reason not to hold an evidentiary hearing.  As discussed below, if the prosecutor does not come

14  forward with a credible non-discriminatory explanation for his action, *Batson* "require[s] that

15  petitioner's conviction be reversed."  476 U.S. at 100.

16         Pursuant to the AEDPA, an evidentiary hearing is appropriate under the following

17  circumstances:

18               If the applicant has failed to develop the factual basis of a
             claim in State court proceedings, the court shall not hold an
19           evidentiary hearing on the claim unless the applicant shows that –

20               (A) the claim relies on –

21                (i) a new rule of constitutional law, made
             retroactive to cases on collateral review by the
22           Supreme Court, that was previously unavailable; or

23                (ii) a factual predicate that could not have been
             previously discovered through the exercise of due
24           diligence; and

25               (B)  the facts underlying the claim would be
             sufficient to establish by clear and convincing
26           evidence that but for constitutional error, no

1

> reasonable factfinder would have found the
> applicant guilty of the underlying offense.

2    28 U.S.C. § 2254(e)(2).

3    Various decisions of the Court of Appeals for the Ninth Circuit establish a three-step

4    process to consider the propriety of an evidentiary hearing in federal court.  Initially, the court

5    must "determine whether a factual basis exists in the record to support the petitioner's claims."

6    *Baja v. Ducharme*, 187 F.3d 1075, 1078 (9th Cir. 1999).  If the facts do not exist or are

7    inadequate and a hearing might be appropriate, then

8

> [the] court's first task in determining whether to grant an
> evidentiary hearing is to ascertain whether the petitioner has

9    > "failed to develop the factual basis of a claim in State court."  If so,
> the court must deny a hearing unless the applicant establishes one

10   > of the two narrow exceptions set forth in §2254(e)(2)(A) & (B).  If,
> on the other hand, the applicant has not "failed to develop" the

11   > facts in state court, the district court may proceed to consider
> whether a hearing is appropriate, or required under <u>Townsend</u>.

12

13   *Id.*; *Insyxiengmay v. Morgan*, 403 F.3d 657, 669-70 (9th Cir. 2005) (same).

14   A petitioner will only be charged with a "failure to develop" the facts if "there is lack of

15   diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams*

16   *v. Taylor*, 529 U.S. 420, 432 (2000). "Under AEDPA, 'a failure to develop the factual basis of a

17   claim is not established unless there is a lack of diligence, or some greater fault, attributable to

18   the prisoner or the prisoner's counsel.'" *Insyxiengmay*, 403 F.3d at 670 (quoting *Williams*, 529

19   U.S. at 432).

20   In the situation presented here, where the court has concluded that petitioner raised an

21   inference of racial discrimination in jury selection but the trial court did not move on to the

22   second and third *Batson* tests, federal courts generally remand for a further hearing at which the

23   prosecutor will be given the chance to explain the reasons for his exclusion of a particular juror.

24   *See Williams v. Runnels*, 432 F.3d at 1110  (ordering a remand for an evidentiary hearing "even

25   though the state represented to the district court that the prosecutor no longer remembers why he

26   utilized his peremptory challenges and could not locate the jury selection notes").  In *Batson*

1   itself, the Supreme Court remanded the matter and instructed, "[i]f the trial court decides that the

2   facts establish, prima facie, purposeful discrimination and the prosecutor does not come forward

3   with a neutral explanation for his action, our precedents require that petitioner's conviction be

4   reversed."  476 U.S. at 100.  *See also Miller-El*, 45 U.S. at 236 (reviewing a case in which the

5   state appellate court had "remanded the matter to the trial court to determine whether Miller-El

6   could show that prosecutors in his case peremptorily struck prospective black jurors

7   because of race"); *Paulino*, 371 F.3d at 1093 (remanding matter to the district court for an

8   evidentiary hearing); *Fernandez,* 286 F.3d at 1080 (same).

9          The state has never been required to present evidence of the prosecutor's actual,

10  non-discriminatory reasons for striking juror R.E.  Accordingly, this court will hold a hearing so

11  the state will have an opportunity to present evidence as to the prosecutor's race-neutral reasons

12  for the exclusion of R.E. and to determine whether the prosecutor violated *Batson* in connection

13  with the selection of petitioner's jury.

14         Good cause appearing, IT IS HEREBY ORDERED that:

15         1.  Petitioner's request for an evidentiary hearing is granted; and

16         2.  This matter is set for evidentiary hearing on June 27, 2008, at 9:15 a.m. before the

17  undersigned in Courtroom #25.

18  DATED:  June 3, 2008.

19

20                                     EDMUND F. BRENNAN
                                       UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26