1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DARRELL M. PATTERSON,

11             Petitioner,                    No. CIV S-02-2321 FCD EFB P

12        vs.

13   EDWARD ALAMEIDA, Warden,

14             Respondent.              FINDINGS & RECOMMENDATIONS

15   _____/

16        Petitioner is a state prisoner proceeding *in propria persona* with an application for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges a 2000 judgment of

18   conviction entered against him in the Sacramento County Superior Court on the charge of

19   robbery.  He seeks relief on the grounds that: (1) the trial court's failure to give a *sua sponte* jury

20   instruction on the inherent unreliability of cross-racial identification prevented him from

21   presenting his defense and violated his right to due process; (2) his trial counsel's failure to

22   request a jury instruction on the inherent unreliability of cross-racial identification constituted

23   ineffective assistance of counsel; (3) the use of CALJIC No. 17.41.1 violated his right to a fair

24   trial; (4) his constitutional rights were violated by the prosecutor's improper use of peremptory

25   challenges to exclude a black juror; and (5) the prosecutor committed misconduct when he

26   commented on petitioner's failure to testify and the trial court erred when it failed to grant a

1

1   motion for new trial on this basis.  Upon careful consideration of the record and the applicable

2   law, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

3   PROCEDURAL AND FACTUAL BACKGROUND[1]

> Viewed in the light most favorable to the judgment, the evidence at
> trial showed defendant walked up to the victim, wrested her purse
> from her and ran away.  The victim screamed for help and ran after
> him.  Three men heard her scream and either witnessed or joined in
> the pursuit.  One of the men eventually tackled defendant and held
> him down until law enforcement officers arrived.
>
> Defendant was charged with one count of robbery (Pen. Code, §
> 211).  An initial trial ended in a mistrial due to jury deadlock.  At
> the second trial, the defense theory was misidentification.  Defense
> counsel argued defendant was a "fourth Good Samaritan" who had
> joined in the pursuit of the actual robber but was then mistaken for
> the robber by the victim and the three eyewitnesses after they each
> lost sight of the robber for a time.
>
> During jury selection, the prosecutor exercised a peremptory
> challenge to excuse a prospective juror who was African-
> American, and defendant made a *Wheeler* motion, which the trial
> court denied.
>
> At trial, the victim identified defendant as her robber and the three
> witnesses all identified defendant as the man they had pursued or
> had seen being pursued.  The court instructed the jury with
> CALJIC No. 2.92 regarding the factors the jury should consider in
> determining what weight to give the eyewitness identifications of
> defendant.  Among other things, the court told the jury it should
> consider "[t]he cross racial or ethnic nature of the identification."
> In closing argument, defense counsel went through the various
> factors, challenging the reliability of the identifications.  Because
> defendant is African-American, and the victim and the three
> witnesses are not, defense counsel argued the cross-racial nature of
> the identifications weighed against their reliability.
>
> The jury found defendant guilty.  The court sentenced defendant to
> the low term of two years for the robbery, doubled for a prior

---

[1]  This statement of facts is taken from the March 8, 2002, opinion by the California
Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-3, appended as
Exhibit D to Respondent's Answer, filed on March 24, 2003.  This court presumes that the state
court's findings of fact are correct unless petitioner rebuts that presumption with clear and
convincing evidence.  28 U.S.C. § 2254(e)(1); *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir.
2004).  Petitioner has not attempted to overcome the presumption with respect to the underlying
events.  The court will therefore rely on the state court's recitation of the facts.

2

1
2
       serious felony conviction, with an additional five-year mandatory term as well, for an aggregate term of nine years in prison.

3        Petitioner filed a timely appeal of his conviction in the California Court of Appeal,

4 raising the same claims he raises in the instant petition.  Answer, Ex. D.  All of petitioner's

5 claims were denied on the merits in a reasoned decision.  *Id.*  On April 17, 2002, petitioner filed

6 a petition for review in the California Supreme Court.  Answer, Ex. E.  That petition was

7 summarily denied by order filed May 22, 2002.  Answer, Ex. F.

8                          ANALYSIS

9 I.  Standards for a Writ of Habeas Corpus

10        Federal habeas corpus relief is not available for any claim decided on the merits in state

11 court proceedings unless the state court's adjudication of the claim:

12
13
      (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

14
15
      (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

16 28 U.S.C. § 2254(d).

17        Under section 2254(d)(1), a state court decision is "contrary to" clearly established

18 United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

19 set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

20 indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

21 result.  *Early v. Packer*, 573 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

22 (2000)).

23        Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court

24 may grant the writ if the state court identifies the correct governing legal principle from the

25 Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

26 case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

1   that court concludes in its independent judgment that the relevant state-court decision applied

2   clearly established federal law erroneously or incorrectly.  Rather, that application must also be

3   unreasonable." *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

4   enough that a federal habeas court, in its independent review of the legal question, is left with a

5   'firm conviction' that the state court was 'erroneous.'")

6        The court looks to the last reasoned state court decision as the basis for the state court

7   judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a

8   decision on the merits but provides no reasoning to support its conclusion, a federal

9   habeas court independently reviews the record to determine whether habeas corpus relief is

10   available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

11   II.  <u>Petitioner's Claims</u>

12       A.  <u>Jury Instruction Error</u>

13         Petitioner raises two claims of jury instruction error.  After setting forth the applicable

14   legal principles, the court will evaluate these claims in turn below.

15         1.  <u>Legal Standards</u>

16         In general, a challenge to jury instructions does not state a federal constitutional claim.

17   *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing *Engle v. Isaac*, 456 U.S. 107,

18   119 (1982)); *Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant

19   federal habeas relief, a challenged jury instructions "cannot be merely 'undesirable, erroneous,

20   or even "universally condemned,"' but must violate some due process right guaranteed by the

21   fourteenth amendment." *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Cupp*

22   *v. Naughten*, 414 U.S. 141, 146 (1973)).  To prevail on such a claim petitioner must demonstrate

23   "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due

24   process.'" *Prantil*, 843 F.2d at 317 (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir.

25   1987)).  *See also Estelle v. McGuire*, 502 U.S. 62, 72 (1991).  In making its determination, this

26   court must evaluate the challenged jury instructions "'in the context of the overall charge to the

jury as a component of the entire trial process.'"  *Prantil*, 843 F.2d at 817 (quoting *Bashor v.*

*Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a refusal or failure to

give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

incomplete instruction, is less likely to be prejudicial than a misstatement of the law."

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  *See also Villafuerte v. Stewart*, 111 F.3d 616,

624 (9th Cir. 1997).

2.  <u>Sua Sponte Instruction on Cross-Racial Identification</u>

Petitioner's first claim is that the trial court violated his right to due process and to

present a defense when it failed to "give *sua sponte* a cautionary instruction on the inherent

unreliability of cross-racial identification."  Pet. at 5.  The last reasoned rejection of this claim is

the decision of the California Court of Appeal on petitioner's direct appeal.  The state court

denied the claim with the following reasoning:

> As noted above, the court instructed the jury with CALJIC No.
> 2.92 regarding the factors for the jury to consider in determining
> what weight to give the eyewitness identifications of defendant.
> Among other things, the court told the jury it should consider
> "[t]he cross [-] racial or ethnic nature of the identification."
> Defendant contends this instruction was deficient because it "did
> nothing [to] educate the jury on the perils of cross-racial
> identification."  Defendant contends the court had a duty to
> instruct the jury not only that it should consider the cross-racial
> nature of the identification, but that cross-racial identifications are
> inherently unreliable.  Defendant is mistaken; the court had no
> such duty.
>
> "A criminal defendant 'is entitled to an instruction that focuses the
> jury's attention on facts relevant to its determination of the
> existence of reasonable doubt regarding identification, by listing,
> in a neutral manner, the relevant factors supported by the
> evidence.' [Citations.] An explanation of the effects of such
> factors, however, 'is best left to argument by counsel, cross-
> examination of the eyewitnesses, and expert testimony where
> appropriate.'" (*People v. Rudge* (1994) 7 Cal.4th 1075, 1110.)
> "The instruction should not take a position as to the impact of each
> of the psychological factors listed . . . .  An instruction that
> 'explained' the influence of the various psychological factors
> would of necessity adopt the views of certain experts and
> incorporate the results of certain psychological studies while
> discounting others.  It would require the trial judge to endorse, and

require the jury to follow, a particular psychological theory relating to the reliability of eyewitness identifications.  Such an instruction would improperly invade the domain of the jury, and confuse the roles of expert witnesses and the judge."  (*People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*).)

The trial court here fulfilled its duty under *Wright* by instructing the jury that it should consider the cross-racial nature of the identifications in deciding what weight to give those identifications.  The court had no further duty to instruct the jury that cross-racial identifications are unreliable; indeed, such an instruction would itself have been error under *Wright*.  It was up to defense counsel to argue the identifications were unreliable because they were cross-racial, which counsel did.  The court had no obligation to put its stamp of approval on that argument.

Citing *People v. Sutton* (1964) 231 Cal.App.2d 511 (*Sutton*), defendant contends the court has a sua sponte duty to give a cautionary instruction "[w]henever evidence must be viewed with a caution."  *Sutton* is of no assistance to defendant.  In *Sutton*, the appellate court concluded the trial court did not err when it failed to instruct the jury, sua sponte, that a witness's commission of a felony is not to be presumed from mere incarceration.  (*Id.* at pp. 514-516.)  In reaching that conclusion, the court observed: "The trial judge is required to instruct only on general principles which are necessary for the jury's understanding of the case and he need not instruct without request, on specific points which might be applicable to the particular case. [Citation.] However, where the judge has a duty to instruct without request on the general principles of law governing the case, failure to perform that duty may be reversible error."  (*Id.* at pp. 515-516.)

This observation from *Sutton* highlights the fatal flaw in defendant's argument.  A trial court has a sua sponte duty to instruct the jury only "on the general principles of *law* governing the case."  (*People v. Sutton*, *supra*, 231 Cal.App.2d at p. 516, italics added.)  The unreliability of cross-racial identifications is not a principle of law; it is a particular psychological theory relating to the reliability of eyewitness identifications.

Defendant also contends a cautionary instruction regarding the unreliability of cross-racial identifications was required because part of his defense theory was that the eyewitness identifications were unreliable because they were cross-racial.  It is true a court has an "affirmative duty to give, *sua sponte*, a correctly phrased instruction on defendant's theory."  (*People v. Stewart* (1976) 16 Cal.3d 133, 140.)  Once again, however, that duty extends only to instructing the jury "'on the general principles of law relevant to the issues raised by the evidence.'"  (*Ibid.*, quoting *People v. St. Martin* (1970) 1 Cal.3d 524, 531.)  Since the unreliability of cross-

1                      racial identifications is not a principle of law, the trial court had no
duty to instruct the jury as defendant suggests.

2

3 Opinion at 10-13.

4        This court agrees with the state appellate court that, under the circumstances of this case,

5 the trial court's failure to give a *sua sponte* jury instruction to the effect that cross-cultural

6 identification is inherently unreliable did not render petitioner's trial fundamentally unfair.  As

7 described above, petitioner's jurors were instructed with CALJIC No. 2.92 on "factors to

8 consider in proving identity by eyewitness testimony."  Clerk's Transcript on Appeal (CT) at

9 114-15.  This instruction informed the jurors that a number of factors could affect the reliability

10 and accuracy of eyewitness identification.  *Id.*  Among those factors were the opportunity of the

11 witness to observe the events and the perpetrator, the stress to which the witness was subjected,

12 "the cross-racial or ethnic nature of the identification," and "any other evidence relating to the

13 witness' ability to make an identification."  *Id.*  This instruction and the considerable attention

14 focused by trial counsel on the identification issue sufficiently alerted the jurors to the fact that

15 they should carefully and critically evaluate the strength of the eyewitness testimony.  Other

16 related jury instructions fully covered the elements required to find a defendant guilty beyond a

17 reasonable doubt, emphasized the government's burden of proof with respect to whether

18 petitioner was the person who committed the robbery, and informed the jurors that they had an

19 exclusive role in assessing the credibility and weight of the evidence.  *Id.* at 98, 112-13.  During

20 closing argument, petitioner's counsel asserted that cross-racial identification was a factor that

21 weighed against the reliability of the witness identifications.  Reporter's Transcript on Appeal

22 (RT) at 404.  Indeed, throughout the argument, counsel focused heavily on the possibility of

23 misidentification.  *Id.* at 379-415.  Defense counsel also cross-examined the eyewitnesses

24 thoroughly in order to highlight any weaknesses in their identification of petitioner as the

25 suspect.  Under these circumstances, petitioner has failed to carry his "heavy" burden to show

26 /////

1  that the trial court's failure to instruct the jury on the inherent unreliability of cross-racial

2  identification rendered his trial fundamentally unfair.

3       Petitioner argues that the trial court's failure to give a *sua sponte* jury instruction that

4  cross-racial identification is inherently unreliable violated his right to present his defense.  In

5  federal court, as in state court, "a criminal defendant is entitled to have a jury instruction on any

6  defense which provides a legal defense to the charge against him and which has some foundation

7  in the evidence, even though the evidence may be weak, insufficient, inconsistent, or of doubtful

8  credibility."  *United States v. Escobar de Bright*, 742 F.2d 1196, 1198 (9th Cir. 1984) (quoting

9  *United States ex rel. Peery v. Sielaff*, 615 F.2d 402, 403 (7th Cir. 1979)).  *See also Bradley v.*

10 *Duncan*, 315 F.3d 1091, 1097 (9th Cir. 2002) (quoting *Mathews v. United States*, 485 U.S. 58,

11 63 (1988)).  Failure to correctly instruct the jury on the defendant's theory of defense may

12 constitute a due process violation.  *Bradley*, 315 F.3d at 1099.

13      As explained by the California Court of Appeal, petitioner's defense was that the

14 eyewitnesses mistakenly identified him as the perpetrator of the robbery, in part because they

15 were not of the same race as petitioner.  In support of this defense, petitioner's jury was

16 instructed that numerous factors, including the cross-racial nature of an identification, could have

17 a negative bearing on the accuracy of the witness' identification of petitioner as the perpetrator.

18 CT at 114.  This instruction adequately covered petitioner's defense theory.  An additional

19 instruction that cross-racial identification is inherently suspect was unnecessary and would, as

20 explained by the state court, go beyond a mere recitation of the law and venture into an improper

21 invasion of the exclusive province of the jury to decide the weight of the evidence.  This court

22 also notes that simply because the witnesses were not of the same race as petitioner does not

23 mean their identification of him as the perpetrator was wrong.  This was simply one factor for

24 the jury to consider in deciding the credibility of the identifications in this case.

25      Finally, petitioner has not cited any United States Supreme Court case holding that a

26 failure to inform a jury that cross-racial identification is inherently unreliable violates a criminal

8

1  defendant's due process right to a fair trial or his right to present a defense based on mistaken

2  identity.  The Court of Appeals for the Ninth Circuit has held to the contrary in the context of a

3  federal criminal trial.  *See United States v. Amaral*, 488 F.2d 1148, 1151 (9th Cir.1973) (holding

4  that it is not plain error for a district court to fail to give a jury instruction *sua sponte* on the

5  "inherent unreliability" of eyewitness identification).  Thus, petitioner has failed to demonstrate

6  that the state court decision rejecting his claim of jury instruction error was contrary to or an

7  unreasonable application of federal law, as determined by the United States Supreme Court.  *See*

8  *Moses v. Payne*, ___ F.3d ___, 2008 WL 4192031 (9th Cir. (Wash.)), at *6 (where no decision of

9  the United States Supreme Court squarely addresses an issue, a state court's adjudication of that

10  issue cannot result in a decision that is contrary to, or an unreasonable application of Supreme

11  Court precedent).

12        For all of the foregoing reasons, petitioner is not entitled to relief on this claim.

13        3.  Use of CALJIC No. 17.41.1

14        Petitioner's jury was instructed with CALJIC No. 17.41.1, which provides as follows:

15            The integrity of a trial requires that jurors, at all times during their
deliberations, conduct themselves as required by these instructions.

16            Accordingly, should it occur that any juror refuses to deliberate or
expresses an intention to disregard the law or to decide the case

17            based on [penalty or punishment, or] any [other] improper basis, it
is the obligation of the other jurors to immediately advise the

18            Court of the situation.

19  CT at 205.  Petitioner claims that this jury instruction violates the First Amendment rights of the

20  jurors because it exerts "a powerful chilling effect" on juror deliberations "by threatening jurors

21  with the prospect that their every word may be reported to the trial court any time that even one

22  other fellow juror imagines an impropriety."  Pet. at consecutive p. 18.  In its decision on

23  petitioner's direct appeal, the California Court of Appeal concluded that CALJIC No. 17.41.1

24  ////

25  ////

26  ////

1   was not erroneous and that petitioner had failed to demonstrate prejudice.  Opinion at 14-22.[2]

2        Petitioner's claim is foreclosed by the Ninth Circuit's decision in *Brewer v. Hall*, 378

3   F.3d 952, 955-57 (9th Cir. 2004).  In *Brewer*, the court held that, regardless of the "constitutional

4   merits" of CALJIC No. 17.41.1, habeas relief was unavailable because there is "no Supreme

5   Court precedent clearly establishing" that use of the instruction violates a defendant's

6   constitutional rights.  *Id.* at 955-56.  Here, as in *Brewer*, petitioner "has pointed to no Supreme

7   Court precedent clearly establishing that CALJIC 17.41.1--either on its face or as applied to the

8   facts of his case--violated his constitutional rights."  *Id.* at 957.  Thus, the state court's rejection

9   of Petitioner's claim was not contrary to or an unreasonable application of clearly established

10  Supreme Court precedent.  28 U.S.C. § 2254(d).  *See Moses*, 2008 WL 4192031 at *6.

11       Even if the instruction were erroneous, the error in this case was harmless under *Brecht v.*

12  *Abrahamson*, 507 U.S. 619, 623 (1993) (holding that a federal court may not grant habeas relief

13  for trial errors without a showing of actual prejudice, defined as a "substantial and injurious

14  effect or influence in determining the jury's verdict").  Petitioner's jury quickly reached a verdict

15  without apparent difficulty.  Unlike the situation in *Brewer*, petitioner's jurors did not ask any

16  questions or communicate with the court in any way before finding petitioner guilty.  There is

17  simply no indication that the giving of CALJIC No. 17.41.1 chilled the jurors' exercise of free

18  speech or prevented free and full deliberations.  The conclusion of the state appellate court that

19  the giving of CALJIC No. 17.41.1 in this case did not result in prejudice is not unreasonable.

20  Accordingly, petitioner is not entitled to relief on this claim.

21  /////

22  /////

23

24      [2] After the state appellate court issued its decision in this case, the California California
    Supreme Court held that CALJIC 17.41.1 did not infringe upon defendant's federal or state
    constitutional right to trial by jury or his state constitutional right to a unanimous jury verdict.
25  *People v. Engelman*, 28 Cal.4th 436 (2002).  However, using its supervisory authority over the
    lower state courts, the Supreme Court discontinued use of CALJIC No. 17.41.1 because of its
26  "potential" to intrude on jury deliberations.  *Id.*

1        B.  Ineffective Assistance of Counsel[3]

2        Petitioner argues that his trial counsel rendered ineffective assistance when he failed to

3   request a jury instruction to the effect that cross-racial identification is inherently unreliable.

4        The Sixth Amendment guarantees the effective assistance of counsel.  The United States

5   Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland*

6   *v. Washington*, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a

7   petitioner must first show that, considering all the circumstances, counsel's performance fell

8   below an objective standard of reasonableness.  *Id.* at 687-88.  After a petitioner identifies the

9   acts or omissions that are alleged not to have been the result of reasonable professional

10  judgment, the court must determine whether, in light of all the circumstances, the identified acts

11  or omissions were outside the wide range of professionally competent assistance.  *Id.* at 690;

12  *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was

13  prejudiced by counsel's deficient performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is

14  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

15  result of the proceeding would have been different."  *Id.* at 694.  A reasonable probability is "a

16  probability sufficient to undermine confidence in the outcome."  *Id.  See also Williams*, 529 U.S.

17  at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

18  determine whether counsel's performance was deficient before examining the prejudice suffered

19  by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

20  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

21  followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955 (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at

22

23        [3]  Petitioner's claim of ineffective assistance of trial counsel is set forth in a handwritten
    section attached to the body of his habeas petition.  The claim is not listed in the main
24  (typewritten) body of the petition.  It is not clear whether petitioner intends to raise in this court
    the claims contained in the handwritten pages, or whether petitioner is simply describing claims
25  raised in the state courts.  However, respondent has addressed petitioner's claim of ineffective
    assistance of trial counsel on the merits.  Answer at 9-11.  Accordingly, in an abundance of
26  caution, this court will also address petitioner's claim of ineffective assistance of counsel in
    these findings and recommendations.

697).

Petitioner has failed to demonstrate prejudice with respect to this claim.  For the reasons described above, there is no reasonable probability that, but for counsel's failure to request a jury instruction to the effect that cross-racial identifications are inherently unreliable, the result of the proceedings would have been different.  Even if petitioner's trial counsel had succeeded in persuading the trial judge to give such an instruction, there is no reasonable probability the jury would have reached a different verdict.  Petitioner's jury was instructed to consider the "cross-racial" nature of the witness identifications, and this factor was stressed to the jury by petitioner's counsel in closing argument.  The instruction suggested by petitioner would have added nothing of significance to the information already before the jury.  Because of petitioner's failure to demonstrate prejudice, this claim should be denied.

C.  Use of Peremptory Challenge

Petitioner claims that his conviction must be reversed because the prosecutor exercised a peremptory challenge to strike a juror on the basis of race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986).

1.  State Court Decision

The California Court of Appeal denied petitioner's *Batson/Wheeler* claim, concluding that petitioner had failed to make a prima facie showing that the prosecutor's challenge to the juror in question was based on race.  The Court of Appeal explained the relevant facts and its legal analysis as follows:

> Defendant contends the trial court erred in denying his *Wheeler* motion after the prosecutor used a peremptory challenge against a prospective juror who was African-American because the timing of the prosecutor's challenge established a reasonable inference the challenge was based on the prospective juror's race.  In denying defendant's motion, the trial court implicitly found defendant had failed to make a prima facie showing the challenge was based on race.  Because there is substantial evidence in the record to support that finding, we conclude the trial court did not err in denying defendant's *Wheeler* motion.

12

The facts relevant to this claim of error are as follows: Defendant is African-American, as was R.E., one of the prospective jurors on the initial panel of 12.  After the initial panel and six other prospective jurors were questioned by the court and counsel, each side exercised three peremptory challenges.  The prosecutor then indicated the People would accept the jury.  The panel at that time included six of the original panel of 12, including R.E., and the other six prospective jurors who had been questioned.  Defense counsel, however, exercised another peremptory challenge, and seven new prospective jurors were called.  After the new prospective jurors were questioned, each side exercised one more peremptory challenge, and the prosecutor again indicated the people would accept the jury, which still included R.E.  Defense counsel, however, exercised another peremptory challenge, which was followed by another challenge from the prosecutor.  The vacant seat on the panel (No. 7) was then filled by another African-American, and defense counsel passed for the first time.  At this point, the prosecutor exercised a peremptory challenge to excuse R.E.  Defense counsel asked to approach and objected to the prosecutor's use of a peremptory challenge against R.E. under *Wheeler*.[4]  The court denied defendant's *Wheeler* motion off the record and proceeded with peremptory challenges.  Defense counsel and the prosecutor both passed and the jury was sworn after two alternates were selected.

That afternoon, the court allowed defense counsel to make a record of his *Wheeler* motion.  Defense counsel informed the court the first trial had resulted in a mistrial because an African-American juror had held out for acquittal.  Counsel then pointed out that the prosecutor had "once, if not more times" accepted the jury with R.E. on it, only to challenge her when a second African-American was seated.  Counsel claimed he had made out a prima facie case of a *Wheeler* violation because the prosecutor had expressed satisfaction with the jury with R.E. on it and because the lone holdout at the first trial had been African-American.  The prosecutor responded that he was not trial counsel at the previous trial and did not know if the holdout had been an African-American.  The prosecutor also contended defendant had failed to make a prima facie showing of a *Wheeler* violation, stating: "There are reasons that [R.E.] stated, and her demeanor here in court speaks for why I would exercise a peremptory challenge. [If] [t]he Court feels a prima facie case can be made I could state my reasons for the record, but I don't think I'm required to do so at this point."  The court asked if defense counsel had anything else, and when counsel said "No," the court denied the motion without further inquiry.

---

[4]  It does not appear from the record what relief defendant requested in his *Wheeler* motion.  We presume, however, defendant sought the appropriate relief, which was to quash or dismiss the jury venire.  *See People v. Williams*, 16 Cal.4th 635, 662, fn. 9 (1997).

13

"It is well settled that the use of peremptory challenges to remove prospective jurors solely on the basis of a presumed group bias based on membership in a racial group violates both the state and federal Constitution."  (*People v. Turner* (1994) 8 Cal.4th 137, 164.)  "Under *Wheeler*, there is a presumption that a prosecutor uses his peremptory challenges in a constitutional manner. [Citation.] The defendant bears the burden to show, prima facie, the presence of purposeful discrimination. [Citation.]  If he succeeds, the burden shifts to the prosecutor to show its absence." (*People v. Alvarez* (1996) 14 Cal.4th 155, 193.)

"Under *Wheeler* and *Batson* [*v. Kentucky* (1986) 476 U.S. 79, 89 (90 L.Ed.2d 69]], '"[i]f a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court. First, . . . he should make as complete a record of the circumstances as is feasible.  Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule.  Third, from all the circumstances of the case he must show a strong likelihood [or reasonable inference] that such persons are being challenged because of their group association . . . .'"  (*People v. Box* (2000) 23 Cal.4th 1153, 1187-1188.)

"The trial court's determination that no prima facie showing of group bias has been made is subject to review to determine whether it is supported by substantial evidence. [Citation.] We examine the record of the voir dire and accord particular deference to the trial court as fact finder, because of its opportunity to observe the participants at first hand."  (*People v. Jenkins* (2000) 22 Cal.4th 900, 993-994.)  "When a trial court denies a *Wheeler* motion because it finds no prima facie case of group bias was established, the reviewing court considers the entire record of voir dire.' [Citation.] 'If the record "suggests grounds upon which the prosecutor might reasonably have challenged" the jurors in question, we affirm.'"  (*People v. Box, supra*, 23 Cal.4th at p. 1188.)

Here, the record does suggest grounds on which the prosecutor might reasonably have challenged R.E.  During voir dire, R.E. indicated her brother had been arrested for a felony and incarcerated the year before.  The incarceration of her brother was a ground on which the prosecutor could reasonably have challenged R.E. because it was evidence she could be biased against the prosecution.  (*See People v. Douglas* (1995) 36 Cal.App.4th 1681, 1689-1690 [finding reasonable use of peremptory challenge when family members of prospective juror had criminal records].)  In fact, immediately before excusing R.E., the prosecutor excused another prospective juror who had stated he knew some people who were involved with the criminal justice

system.  This tends to bolster the suggestion the prosecutor
excused R.E. because of her brother's incarceration.

In addition, the prosecutor referred to R.E.'s "demeanor here in
court" as a reason why he exercised a peremptory challenge
against her.  Although R.E.'s demeanor is not apparent on the face
of the record on appeal, the trial court certainly was in a position to
evaluate whether that factor could have played a legitimate role in
the prosecutor's peremptory challenge of R.E.  "[S]ubjective
factors, not apparent on the record or easily articulable, may
legitimately play a critical role in an attorney's exercise of a
peremptory challenge."  (*People v. Jackson* (1996) 13 Cal.4th
1164, 1249.)  That is the reason "we generally defer to the findings
of the trial court."  (*Ibid.*)

Defendant contends any explanation for the prosecutor's challenge
of R.E. other than her race "must be rejected as highly implausible
because the prosecut[or] twice accepted the jury panel when it
included" R.E. and challenged her only after another African-
American was seated on the jury.  The timing of the prosecutor's
challenge, however, does not compel us to overturn the trial
court's implied finding the challenge was not race-based.  It is not
unusual for counsel to exercise peremptory challenges based on the
composition of the jury as a whole.  As our Supreme Court has
acknowledged: "It is clear that knowledge of the composition of
the entire panel can be relevant to the informed exercise of a
peremptory challenge against a particular juror." (*People v.
Wright* (1990) 52 Cal.3d 367, 397.)  That the prosecutor was twice
satisfied with a panel that included R.E., but later changed his
mind when another prospective juror who was also African-
American was seated, does not lead inexorably to the conclusion
the prosecutor's dissatisfaction with R.E. must have been
motivated by a desire to limit the jury to one African-American.
Any number of factors may have played into the prosecutor's
determination that the panel's composition was unacceptable when
he finally decided to excuse R.E.  In this regard, it is significant to
note the prosecutor initially accepted a panel that included
prospective juror M.J., but then exercised his very next peremptory
challenge to excuse M.J. after defense counsel had excused another
prospective juror.  That another prospective juror suffered the
same fate as R.E. undercuts defendant's suggestion that the timing
of the prosecutor's peremptory challenge of R.E. proves the
challenge must have been race-based.

Defendant also contends the prosecutor's challenge of R.E. must
have been based on her race because "the prosecutor showed a
keen interest in whether she thought that African [-] Americans
were treated unfairly by the criminal justice system."  The record
shows that after eliciting from R.E. the fact her brother was
incarcerated, the prosecutor asked R.E. if she had "any feelings in
particular one way or another as to whether the criminal justice

system is fair or unfair toward African [-] Americans?"  When R.E. responded "No," the prosecutor then asked the same question of the rest of the panel.

Defendant contends "[t]his disparate treatment of [R.E.] in being singled out to answer questions about her view towards African [-] American[s'] treatment in the courts further suggests group bias." We disagree.  The prosecutor asked the same question of all the prospective jurors; he may have asked R.E. the question first simply because the idea to ask the question was sparked by her statement that her brother was incarcerated.  In any event, as noted above, our task is to review the trial court's implied finding that defendant did not make a prima facie showing of a *Wheeler* violation for substantial evidence.  Because the record suggests grounds on which the prosecutor might reasonably have challenged R.E., we conclude substantial evidence supports the trial court's finding.  Neither the timing of the prosecutor's challenge nor the prosecutor's question regarding how the justice system treats African-Americans compels a different result.

Having participated in the jury selection process, the trial judge was in the best position to determine under all the relevant circumstances whether it was reasonable to infer the prosecutor challenged R.E. because of her race.  (*See People v. Box, supra,* 23 Cal.4th at p. 1189.)  Because there is substantial evidence in the record to support the trial court's implied finding that defendant did not make a prima facie showing the challenge was race-based, we conclude the court did not err in denying defendant's *Wheeler* motion.

Opinion at 3-10.

### 2. Prior Proceedings in this Court

By order dated June 3, 2008, this court determined that a *de novo* standard of review, and not the AEDPA deferential standard, must be employed when deciding petitioner's *Batson/Wheeler* claim.  *See* June 3, 2008 order at 6-11.  This court also determined that petitioner had demonstrated a prima facie case sufficient to require a rebuttal of the claim of racial discrimination with respect to the prosecutor's exercise of a peremptory challenge against juror R.E.  *Id.* at 11-19.  Because of the court's decision in this regard, an evidentiary hearing was held in the courtroom of the undersigned on June 27, 2008, in order to afford the prosecutor the opportunity to explain his reasons for excluding R.E from petitioner's jury.  Subsequent to that evidentiary hearing, on August 7, 2008, petitioner filed a "Post-Evidentiary Hearing

1  Memorandum in Support of Petition for Writ of Habeas Corpus" (Petitioner's Brief).  On August

2  29, 2008, respondent filed a "Post-Evidentiary Hearing Brief" (Respondent's Brief).  On

3  September 6, 2008, petitioner filed a "Reply to Respondent's Post-Evidentiary Hearing Brief"

4  (Petitioner's Reply).  This court has considered those briefs in issuing these findings and

5  recommendations.

6                        3.  <u>Legal Standards Regarding Petitioner's Batson/Wheeler Claim</u>

7          Purposeful discrimination on the basis of race or gender in the exercise of peremptory

8  challenges violates the Equal Protection Clause of the United States Constitution.  *See Batson*,

9  476 U.S. at 79; *Johnson v. California*, 545 U.S. 162 (2005).  So-called *Batson* claims are

10  evaluated pursuant to a three-step test:

11            First, a defendant the movant must make a prima facie showing
          that the prosecution has engaged in the discriminatory use of a

12            peremptory challenge by demonstrating that the circumstances
          raise "an inference that the prosecutor used [the challenge] to

13            exclude veniremen from the petit jury on account of their race."
          [Citation omitted.]  Second, if the trial court determines a prima

14            facie case has been established, the burden shifts to the prosecution
          to articulate a [gender]-neutral explanation for challenging the

15            juror in question.  [Citation omitted.]  Third, if the prosecution
          provides such an explanation, the trial court must then rule

16            whether the movant has carried his or her burden of proving the
          existence of purposeful discrimination.

17

18  *Tolbert v. Page*, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).

19          In order to establish a prima facie case of racial discrimination, petitioner must show that

20  "(1) the prospective juror is a member of a "cognizable racial group," (2) the prosecutor used a

21  peremptory strike to remove the juror, and (3) the totality of the circumstances raises an

22  inference that the strike was motived by race."  *Boyd v. Newland*, 467 F.3d 1139, 1143 (9th Cir.

23  2006) (citing *Batson*, 476 U.S. at 96 and *Cooperwood v. Cambra*, 245 F.3d 1042, 1045-46 (9th

24  Cir. 2001)).  A prima facie case of discrimination "can be made out by offering a wide variety of

25  evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory

26  ////

1   purpose.'" *Johnson*, 545 U.S. at 169 (quoting *Batson*, 476 U.S. at 94.)[5]   In evaluating whether a

2   defendant has established a prima facie case, a reviewing court should consider the "'totality of

3   the relevant facts' and 'all relevant circumstances' surrounding the peremptory strike." *Boyd*,

4   467 F.3d at 1146 (quoting *Batson*, 476 U.S. at 94, 96).   This should include a review of the entire

5   transcript of jury voir dire in order to conduct a comparative analysis of the jurors who were

6   stricken and the jurors who were allowed to remain.   *Boyd*, 467 F.3d at 1050 ("We believe,

7   however, that Supreme Court precedent requires a comparative juror analysis even when the trial

8   court has concluded that the defendant failed to make a prima facie case").   *See also Miller-El v.*

9   *Dretke*, 545 U.S. 231 (2005) (utilizing comparative analysis, in a case in which a prima facie

10   showing had been made, to determine whether the prosecutor had been motived by racial bias in

11   exercising peremptory challenges).[6]

12        At the second step of the *Batson* analysis, "'the issue is the facial validity of the

13   prosecutor's explanation." *Hernandez v. New York*, 500 U.S. 352, 360 (1991).   "A neutral

14   explanation in the context of our analysis here means an explanation based on something other

15   than the race of the juror." *Id.* at 360.   "Unless a discriminatory intent is inherent in the

16   prosecutor's explanation, the reason offered will be deemed race-neutral." *Stubbs v. Gomez*, 189

17   F.3d 1099, 1105 (9th Cir. 1999) (quoting *Hernandez*, 500 U.S. at 360).   For purposes of step

18   two, the prosecutor's explanation need not be "persuasive, or even plausible." *Purkett v. Elem*,

19   514 U.S. at 765, 768 (1995).   Indeed, "to accept a prosecutor's stated nonracial reasons, the court

20

21        [5]   In *Batson*, defense counsel made a timely objection to the prosecutor's use of
     peremptory challenges because they resulted in the striking of "all black persons on the venire."
22   *Batson*, 476 U.S. at 100.   The Supreme Court held that this was sufficient basis to find an
     inference of racial discrimination and that the trial court erred when it "flatly rejected the
     objection without requiring the prosecutor to give an explanation for his action." *Id.*
23

24        [6]   Comparative juror analysis refers to "an examination of a prosecutor's questions to
     prospective jurors and the jurors' responses, to see whether the prosecutor treated otherwise
25   similar jurors differently because of their membership in a particular group." *Boyd*, 467 F.3d at
     1145.   *See also Miller-El*, 125 S.Ct. at 2325 (stating that "side-by-side comparisons of some
26   black venire panelists who were struck and white panelists allowed to serve" was "more
     powerful" than bare statistics).

need not agree with them." *Kesser v. Cambra*, 465 F.3d at 351, 359 (9th Cir. 2006). "It is not until the *third* step that the persuasiveness of the justification becomes relevant--the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. 765, 768 (1995) (emphasis in original). The question is whether, after an evaluation of the record pertaining to that particular case, the prosecutor's race-neutral explanation for a peremptory challenge should be believed. *Id.*

In the third step of a *Batson* challenge, the trial court has "the duty to determine whether the defendant has established purposeful discrimination," *Batson*, 476 U.S. at 98, and, to that end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons. *See Purkett*, 514 U.S. at 768. In determining whether petitioner has carried this burden, the Supreme Court has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Batson*, 476 U.S. at 93 (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)); *see also Hernandez*, 500 U.S. at 363. "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768. *See also Lewis v. Lewis*, 321 F.3d 824, 830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.") In step three, the court "considers all the evidence to determine whether the actual reason for the strike violated the defendant's equal protection rights." *Yee v. Duncan*, 463 F.3d 893, 899 (9th Cir. 2006). "A court need not find all nonracial reasons pretextual in order to find racial discrimination." *Kesser*, 465 F.3d at 360.

The defendant bears the burden of persuasion to prove the existence of unlawful discrimination. *Batson*, 476 U.S. at 93. "This burden of persuasion 'rests with, and never shifts from, the opponent of the strike.'" *Id.* at 2417 (quoting *Purkett*, 514 U.S. at 768). However, "the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a

1  mind to discriminate.'"  *Batson,* 476 U.S. at 96 (quoting *Avery v. Georgia*, 345 U.S. 559, 562

2  (1953).

3      4.  Analysis

4      Petitioner claims that the prosecutor's reasons for striking juror R.E., which he described

5  at the June 27, 2008 evidentiary hearing, were a pretext for racial discrimination.  Accordingly,

6  this court will evaluate the record to determine whether the prosecutor's stated reasons for

7  excluding juror R.E. from petitioner's jury pass constitutional muster.[7]

8      At the evidentiary hearing, the prosecutor explained that he exercised a peremptory

9  challenge against R.E. because she had a negative demeanor during voir dire and because he

10  believed the overall makeup of the jury would be more favorable to the prosecution if R.E. was

11  replaced by another juror on the panel.  Specifically, he stated that when he first viewed the

12  prospective panel, as a whole, he "wasn't thrilled" because he felt the panel members were not

13  "by and large . . . pro prosecution jurors."  Transcript of June 27, 2008 evidentiary hearing

14  (EHT) at 7.  He explained that the method of jury selection employed at petitioner's trial allowed

15  the attorneys to see who would be the next person called to the jury box if they exercised a

16  peremptory challenge against a juror who was already seated.  *Id.* at 10.  Thus, he elaborated, "if

17  you have someone that you think is maybe not a great juror for your case, you feel a little more

18  comfortable in exercising your peremptories [against that person] because you have an idea of

19  who's going to come up next."  *Id.*  In other words, an attorney could "kick this person up here

20  because I like this person down here better."  *Id.*

21      The prosecutor testified that juror R.E. seemed "disengaged" and uninterested in the jury

22  selection process and that she didn't appear to interact with the other jurors.  *Id.* at 14.  He

23

24      [7]  The parties agree that petitioner bears the burden of proving his factual contentions by
a preponderance of the evidence, and not by clear and convincing evidence, because the state
25  court decision is not entitled to the deference bestowed by AEDPA.  Petitioner's Brief at 5-6;
Respondent's Brief at 6-7.  *See Taylor v. Maddox*, 366 F.3d 992, 1013 n.16 (9th Cir. 2004).  This
26  court concludes that petitioner's *Batson* claim should be denied regardless of the standard used.

initially had concerns about R.E. because her questionnaire stated that her brother had been convicted of a felony and she had been a witness to a murder.  When she was questioned about these matters during voir dire, however, R.E. assured the prosecutor that she didn't "have a problem with the criminal justice system." *Id.* at 16.  Nonetheless, he felt that R.E.'s demeanor when answering his questions was unfavorable when compared with the demeanor of other jurors. *Id.*  The prosecutor explained that R.E. was "spacey," didn't seem to understand what was happening, did not make eye contact, and was not really paying attention. *Id.* at 17.  He stated that her manner was "odd and unusual." *Id.*  He also stated that she "stare[d] off into the middle of space" and gave "very short yes or no answers." *Id.* at 18.

The prosecutor acknowledged that, at one point during the selection process, he accepted the jury with R.E. on it. *Id.* at 21.  When asked why he did this in spite of his reservations about R.E., he explained that he believed the composition of the jury at that time was "about as good as I'm going to get." *Id.*  He credibly explained that he was not "thrilled" with the jury as it stood, but that "it could get a lot worse," so he decided to "stay with what I've got." *Id.*

The prosecutor explained that he eventually exercised a challenge against R.E. because he felt that the defense had removed some jurors who were potential leaders, thereby making R.E. even less desirable as a member of the jury. *Id.* at 28.  He felt the need to "get some stronger people on there." *Id.*  Specifically, he wanted prospective juror Zamzow on the panel, so he excused juror R.E. in order to get Zamzow.[8] *Id.*  The prosecutor summarized his intentions with respect to the jury, and specifically juror R.E., as follows:

> No, it was simply a matter of trying to look at the jury as a whole,
> and what we were trying to do is get everybody that's going to
> work together, and as the composition changes, the inter-relations

---

[8]  The prosecutor initially testified he wanted juror Duke to replace juror R.E. *Id.* at 30.  However, when reminded that Mr. Duke was already on the jury when he excused R.E., the prosecutor explained that he had actually excused R.E. in order to obtain Mr. Zamzow on the jury. *Id.* at 30-32.  He felt that Mr. Zamzow would be a better candidate because he seemed grounded and appeared to be a leader. *Id.* at 32.

1   of the jurors change, and your ability to have a stronger or weaker
    person changes along with it.

2

3   At that point, I looked at who was left, and I thought, you know, I
    believe two of them actually became the alternates as well.  The
4   remaining group I felt were better than what I had with [juror
    R.E.].  The prior times – the first time I passed on her, I don't think
5   – I didn't know who was out there other than a random additional
    34 people that were sitting in the gallery.

6   *Id.* at 33.

7          This court held the evidentiary hearing because of petitioner's prima facie showing which

8   warranted some explanation from the prosecutor for his challenge to juror R.E.  June 3, 2008

9   Order at 19-20.  The second step of the *Batson/Wheeler* analysis is to examine the "facial

10  validity of the prosecutor's explanation."  *Hernandez*, 500 U.S. at 360.  The court finds that the

11  prosecutor's stated reasons for exercising a peremptory challenge against juror R.E. – her

12  negative demeanor and the changing composition of the jury – were facially race-neutral.  His

13  reasons were not based on the race of R.E and there was no discriminatory intent inherent in his

14  explanations.  *Id.*

15         The third step of the *Batson* analysis is to determine whether the prosecutor's race-

16  neutral explanations were sincere or whether they were a pretext for deliberate discrimination.

17  *Kesser*, 465 F.3d at 359.  One manner of framing the question is whether, in light of the evidence

18  and testimony presented, the prosecutor's nondiscriminatory explanation is worthy of credence

19  or instead appears to be a pretext to mask an unlawful motive.

20         Petitioner argues that all of the prosecutor's stated reasons for excusing juror R.E.

21  revolved around her demeanor.  Petitioner's Brief at 8.  He notes that the prosecutor did not raise

22  any objective reason for excluding R.E., such as her answers on the juror questionnaire or during

23  jury voir dire.  *Id.*  Petitioner contends that the recent United States Supreme Court case *Snyder*

24  *v. Louisiana*, 128 S.Ct. 1203 (2008) precludes this court from crediting the prosecutor's

25  statements that he excluded R.E. on the basis of her demeanor because the trial court did not

26  explicitly confirm the prosecutor's assessment of R.E.'s demeanor.

1    In *Snyder*, the prosecutor exercised peremptory challenges against all five of the

2  prospective black jurors.  When defense counsel made a *Batson* objection concerning one of

3  those jurors, the prosecutor explained that he exercised a challenge against the juror for two

4  reasons: (1) the juror appeared to be nervous during voir dire; and (2) the juror expressed a

5  concern that he would miss college classes if he served on the jury and the prosecutor was

6  worried the juror might rush to judgment in order to get back to school.  128 S.Ct. at 1208.

7  Although the defense disputed both of these explanations, the trial court summarily overruled the

8  *Batson* challenge.  *Id.*  The United States Supreme Court reversed the denial of Snyder's appeal,

9  concluding that the prosecutor's stated reasons for excluding the juror were a pretext for racial

10  discrimination.

11    The Supreme Court first emphasized that the third *Batson* step "involves an evaluation of

12  the prosecutor's credibility," and that "the best evidence of discriminatory intent often will be

13  the demeanor of the attorney who exercises the challenge."  *Id.* at 1208, 1213 (internal quotation

14  marks and citation omitted).  The court also noted that race-neutral reasons for peremptory

15  challenges "often invoke a juror's demeanor" and that "determinations of credibility and

16  demeanor lie peculiarly within a trial judge's province."  *Id.* at 1208.  The court explained, "[i]n

17  this situation, the trial court must evaluate not only whether the prosecutor's demeanor belies a

18  discriminatory intent, but also whether the juror's demeanor can credibly be said to have

19  exhibited the basis for the strike attributed to the juror by the prosecutor."  *Id.*  The Supreme

20  Court described the trial court's role in evaluating *Batson* claims as "pivotal" because of that

21  court's ability to evaluate the demeanor of both the prosecutor and the excluded juror(s).  *Id.*

22    Considering the nervousness justification first, the Supreme Court concluded that it was

23  unable to defer to the trial court's conclusion that no discrimination had occurred because there

24  was no evidence the trial judge based his *Batson* ruling on the juror's demeanor.  *Id.*  In other

25  words, because the trial court had not made an express determination regarding the prosecutor's

26  first reason – the juror's demeanor – the court refused to presume that the trial court relied on

that reason in denying the *Batson* challenge.  *Id.*  The court noted that the trial judge did not describe his own observation of the juror's demeanor and may not have agreed with the prosecutor that the juror seemed nervous.  Accordingly, the Supreme Court rejected the prosecutor's first rationale because it did not find any evidence in the record to support his contention that the juror appeared nervous.  *Id.* at 1208-1209.

The Supreme Court then considered the prosecutor's second rationale and rejected it after an analysis of the specific facts of that case.  *Id.* at 1209-1212.  Because the court found no support in the record for either of the prosecutor's stated reasons for eliminating the juror in question, and because "the record does not show that the prosecution would have presumptively challenged [the juror] based on his nervousness alone," it concluded that the prosecutor's proffer was pretextual and that he had exercised the challenge with discriminatory intent.  *Id.* at 1212. Put another way, the Supreme Court concluded that the adverse inference created by the use of the second, pretextual reason was not overcome by the first reason, which found no support in the record.

In this case, as in *Snyder*, there is no evidence in the record that the trial court agreed with the prosecutor that R.E.'s demeanor justified a peremptory strike.[9]  Therefore, there is no evidence before the court to support the prosecutor's contention that R.E. had a poor demeanor. However, the prosecutor challenged R.E. not only because of her bad attitude during voir dire, but also because of the evolving nature of the jury and the prosecutor's assessment of R.E.'s place in it.  This second rationale for excusing R.E. is not the same as a rationale based on a specific aspect of a juror's demeanor.  During the evidentiary hearing, this court was able to evaluate the prosecutor's demeanor while he was explaining his strike of R.E.  Specifically, this court was able to evaluate "whether the prosecutor's demeanor belies a discriminatory intent." *Snyder*, 128 S.Ct. at 1208.  In that respect, this court stood in the place of the trial court in its

---

[9]  Indeed, the trial court's failure to inquire into the reason(s) for the challenge is what occasioned the need for the evidentiary hearing here.

role of assessing the credibility of a prosecutor who is responding to a *Batson* challenge. As noted above, the United States Supreme Court in *Snyder* has observed that the demeanor of the prosecutor when describing his peremptory challenge of a particular juror, "is often the best evidence of discriminatory intent." *Id. See also Hernandez*, 500 U.S. at 365 ("the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge").

This court finds the prosecutor's testimony, and specifically, his explanation for the strike to be credible. His demeanor and manner of testifying were sincere. There was no evidence in his demeanor that the strike of R.E. was for discriminatory reasons, nor is there any evidence in the record which contradicts the prosecutor's assertion that he struck R.E. because of his overall impression of the strength of the jury. Aside from his complaints about R.E.'s demeanor, the prosecutor testified extensively about his efforts to come up with a cohesive jury, using his notes he had recorded during jury selection to corroborate his explanations. He explained that he accepted and then challenged R.E. because of his changing assessment of the personality of the jury panel as it evolved during the jury selection process. The court notes that the fact a prosecutor's reasons may be "founded on nothing more than a trial lawyer's instincts about a prospective juror" does not "diminish the scope of acceptable invocation of peremptory challenges, so long as they are the actual reasons for the prosecutor's actions." *United States v. Power*, 881 F.2d 733, 740 (9th Cir. 1989) (quoting *United States v. Chinchilla*, 874 F.2d 695, 699 (9th Cir. 1989)).

It is true that the record does not corroborate the prosecutor's overall sense of the jury and his opinion that R.E. was not as good a juror as someone else who was waiting in the jury box. Nor could it. The prosecutor's observations in this regard are largely subjective and are not necessarily amenable to corroboration by the trial judge. This court does not construe *Snyder* to mean that a prosecutor cannot legitimately exclude a juror based on his sense of the jury as a whole unless the trial court judge specifically credits the prosecutor's impression of all of the

1  jurors.  The United States Supreme Court did not reverse Snyder's conviction because the trial

2  court had failed to explain itself clearly, but because it was unclear whether the trial court's

3  finding rested on a plausible or implausible explanation for the strike.  After listening to the

4  prosecutor's reasons for the strike of R.E., the court finds that the prosecutor's testimony was

5  credible and concludes that his stated reasons were not a pretext for racial discrimination but

6  were, in fact, the actual reasons for his strike of R.E.

7      This court also notes that, in *Snyder*, the prosecutor challenged all five black prospective

8  jurors.  Here, the prosecutor passed at one point in the jury selection process with two African-

9  Americans, including R.E., on the panel.  EHT at 26.  In addition, at one point he excused a

10  white juror in order to get a black juror on the panel, and passed the jury with another juror who

11  he subsequently excused because of the changing composition of the jury.  *Id.* at 22-24.  These

12  actions corroborate the prosecutor's explanation that he excused R.E., as he did other jurors,

13  because of the evolving personality of the jury.  As noted above, when ruling on alleged *Batson*

14  error, "all of the circumstances that bear upon the issue of racial animosity must be consulted."

15  *Snyder*, 128 S.Ct at 1208.  In addition, unlike the situation in *Snyder*, none of the prosecutor's

16  rationales for the strike of R.E. is "unconvincing," "highly speculative," suspicious," or

17  "implausible."  *Snyder*, 128 S.Ct. at 1210-12.

18      When deciding a *Batson* claim, the "decisive question [is] whether counsel's race-neutral

19  explanation for a peremptory challenge should be believed."  *Id.* at 1212 (quoting *Hernandez*,

20  500 U.S. at 365).  In this regard, the fact finder is tasked with considering the genuineness of an

21  attorney's explanation, rather than its reasonableness.  *Purkett*, 514 U.S. at 769.  That is because

22  the fact finder is in the best position to evaluate an attorney's candor and ferret out purposeful

23  discrimination.  *Miller-El*, 537 U.S. at 339.  In this case, the court concludes that the

24  prosecutor's stated reasons for excusing R.E. were his genuine reasons for exercising a

25  peremptory strike, rather than pretexts invented to hide purposeful discrimination.  Petitioner has

26  therefore failed to carry his burden of proving the existence of unlawful discrimination.

1   Accordingly, his claim based on *Batson* must be denied.

2        D.   *Griffin* Error

3        In the handwritten pages attached to the body of the instant petition, petitioner claims that

4   the prosecutor committed misconduct when he commented on petitioner's failure to testify (so-

5   called *Griffin* error) and that the trial court erred when it failed to grant a motion for new trial on

6   this basis.  *See* Pet. at consecutive pgs. 24-31.  Again, because these claims are contained in

7   handwritten pages attached to the instant petition, it is not clear to the court whether petitioner

8   intends to raise them here.  The claims do not appear to have been exhausted in the state courts

9   and respondent has not addressed them in his answer.

10       Assuming *arguendo* that petitioner intends to raise these claims in the petition before this

11  court, the court will recommend that they be denied pursuant to 28 U.S.C. § 2254(b)(2) ("[a]n

12  application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure

13  of the applicant to exhaust the remedies available in the courts of the State").  *See also Cassett v.*

14  *Stewart*, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may

15  deny an unexhausted claim on the merits when it is perfectly clear that the claim is not

16  "colorable").

17       The state court record reflects that, prior to jury voir dire, petitioner's counsel filed a

18  "motion for supplemental jury voir dire," requesting that he be allowed to ask each prospective

19  juror the following questions, among others:

20           1.  Do you think that a [sic] Mr. Patterson should testify at this
             trial?
21
             2.  Would you be able to find Mr. Patterson "Not Guilty" if you do
22           not hear him/her testify?

23           3.  Do you understand that a defendant need not testify?

24           4.  Do you believe that a defendant would lie when testifying under
             oath simply because he/she faces the possibility of conviction?
25

26  CT at 159.  During voir dire, the *prosecutor* made the following remarks:

27

1
2
3
4

Okay.  Now, we all just got done saying we're going to follow the law and have no problem with it.  Here comes a big question.  The law says a defendant does not have to get up here on the witness stand and testify.  He has an absolute right not to testify if he doesn't want to.  It's up to him.  Are any of you in any way, shape or form going to hold it against the Defendant if he decides not to testify?  Okay.

5
6
7

Frequently we hear people after jury service is done say you know what, I think if he was innocent he would have got up on the stand and told me so, and I wanted to hear that.  He didn't testify, therefore, he must have been guilty.  Okay.  It doesn't work that way.

8
9
10
11
12

Okay.  Can all of you promise me you're not going to have those thoughts enter your head during this trial if the Defendant doesn't testify?  Okay.  Most of you nodding yes.
Now, whether or not the Defendant testifies – if he does, great – can you judge his testimony along with all the other witnesses equally?  Would you all use the same standards of credibility in judging all witness' testimony, whether police officers, civilian witnesses, victims or the Defendant?  Treat them all the same?  Okay.

13   Augmented Reporter's Transcript on Appeal (ART) at 820-21.  After the verdict was rendered,

14   petitioner filed a motion for new trial, arguing that the prosecutor committed *Griffin* error.  CT at

15   223-27.  That motion was denied by the trial court on the grounds that: (1) the prosecutor's

16   statements were a correct recitation of petitioner's Fifth Amendment right not to testify; (2) the

17   statements occurred during voir dire and not during argument; and (3) the remarks were not

18   "overly emphasized to the point where the defendant was prejudiced."  RT at 476.

19       Petitioner argues that the prosecutor's remarks constituted an improper comment on his

20   right not to testify and focused the jury's attention on the possibility that the reason petitioner

21   declined to testify was that he was guilty.  He claims that the trial court should have granted his

22   motion for new trial on the basis of the prosecutor's misconduct.[10]

23

24
25
26

[10]  Petitioner represents that his trial counsel requested a mistrial immediately after the prosecutor made the offending remarks and that the request was denied by the trial judge on the basis that the remarks did not result in a miscarriage of justice.  Pet. at consecutive p. 28.  The portion of the state trial transcript reflecting counsel's request for mistrial, if any, has not been lodged with this court.  *See* ART at 823.  However, for the reasons discussed below, the trial

28

The Fifth Amendment prohibits a prosecutor from commenting to the jury regarding the defendant's failure to testify at trial. *Griffin v. California*, 380 U.S. 609, 615 (1965).  A prosecutorial comment in argument runs afoul of the rule "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987).  However, relief is to be granted on such a claim only "'where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal.'" *Id.* (citations omitted). *See also Beardslee v. Woodford*, 358 F.3d 560, 587 (9th Cir. 2004); *United States v. Olano*, 62 F.3d 1180, 1196 (9th Cir. 1995); *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir. 1993).  Conversely, relief will not be granted where the prosecutorial comment is a single, isolated incident, does not stress the inference of guilt from silence as a basis for the verdict and is followed by a curative instruction. *Lincoln*, 807 F.2d at 809.

This court concludes that no error of constitutional magnitude occurred here.  The evidence against petitioner was overwhelming.  In addition, petitioner's jury was instructed as follows:

> A defendant in a criminal trial has a constitutional right not to be compelled to testify.  You must not draw any inference from the fact that a defendant does not testify.  Further, you must neither discuss this matter nor permit it to enter into your deliberations in any way.
>
> In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him.  No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element.

CT at 193-94.  These instructions clearly informed the jurors that they could not treat petitioner's

court's refusal, if any, to grant petitioner a new trial on this basis did not violate petitioner's federal constitutional rights.

silence as substantive evidence of guilt, that they were not to draw any negative inference from petitioner's failure to testify, and that they could not penalize petitioner for failing to fill in material gaps in the evidence. Further, the prosecutor's comments did not ask the jury to draw an adverse inference based on petitioner's election not to testify. Given the circumstances, petitioner has failed to show prejudicial error by virtue of the prosecutor's comments or that the trial court committed federal constitutional error when it failed to grant petitioner a new trial on the basis of *Griffin* error. Accordingly, petitioner is not entitled to relief on these claims.

For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 4, 2008.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE